**Not for Publication in West's Federal Reporter**

# United States Court of Appeals

## For the First Circuit

No. 07-1799

DEBY LEDY MALONDA, ET AL.,

Petitioners,

v.

MICHAEL B. MUKASEY,[*] ATTORNEY GENERAL,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

---

Before

Lynch, Chief Judge,
Tashima,[**] Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Yan Wang, on brief for petitioner.
Peter D. Keisler, Assistant Attorney General, Civil Division,
U.S. Department of Justice, Terri J. Scadron, Assistant Director,
Office of Immigration Litigation, and Anthony W. Norwood, Senior
Litigation Counsel, on brief for respondent.

---

July 14, 2008

---

[*]      Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Michael B. Mukasey has been substituted for his predecessor, former
Attorney General Alberto R. Gonzales.

[**]    Of the Ninth Circuit, sitting by designation.

**TASHIMA**, **Senior Circuit Judge**.  Deby Ledy Malonda, a.k.a. Virginia Sandra Malonda, and her husband Erick Rawung, both natives of Indonesia, petition for review of a decision by the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  Malonda[1] contends that the BIA's denial of her claims was not supported by substantial evidence, and that the Immigration Judge's ("IJ") finding of removability violated her right to due process.  We disagree, and deny the petition.

## I.  Background

Malonda first came to the United States in 1996.  While here, she met Rawung, who had entered the country separately on October 4, 1995, and the two married in 1999.  After last entering the United States on July 4, 2001, Malonda filed an application for asylum on May 20, 2002, on behalf of herself, as well as Rawung as a derivative applicant.

Malonda identified herself as "Deby Ledy" on the application form and reported her date of birth as April 14, 1965.  She claimed to have a valid visa at the time of her entry, also in the name of Deby Ledy Malonda, and attached a copy of that visa, which was valid from September 20, 2000, to September 19, 2005, to her application.  On the other hand, she signed the application

---

[1]    Because Rawung is a derivative applicant for asylum, we will refer to both petitioners collectively as "Malonda."

-2-

"Virginia Malonda" and printed that name below her signature. In Part C of the form, requesting "Information About Your Claim to Asylum," Malonda also identified herself as "Virginia." Further, Malonda appended to her application an Affidavit, dated April 28, 2002, which began, "My name is Virginia Malonda." Several of the other documents she attached to her application also identified her as "Virginia," including a United States visa issued on August 8, 1996, and expiring on November 8, 1996; a certificate of church membership; her marriage certificate; her own birth and baptismal certificates; and the birth certificates of her two American-born, and two Indonesian-born, children. Malonda was interviewed by an Asylum Officer on February 4, 2004, and approved of corrections made to her application identifying her as "Virginia Sandra" and reporting her date of birth as February 27, 1967. She also signed her name as "Virginia Malonda" in the presence of the Asylum Officer.

In her application for asylum, Malonda stated that she did not feel safe in Indonesia due to her Christian faith. She referred to one incident in particular, occurring on June 6, 2001, where she was aroused from sleep by a person wearing "Jilbab the Muslim robes that wanted to kill" her. He pointed a steel object, like a screwdriver, at her, but she was not fearful. Instead, she yelled, "Lord Jesus Help Me," and received the strength to push him away. She referred to attached news articles chronicling the

persecution of Christians at the hands of Indonesian Muslims to support her claim that Christians were being persecuted in Indonesia. She also stated that the government was not willing to protect Christians, leaving people like her to fend for themselves.

On February 12, 2004, Immigration and Customs Enforcement ("ICE") initiated removal proceedings against Malonda and Rawung by filing Notices to Appear ("NTA"). Malonda's NTA charged her with removability based on entering the country without possessing a valid visa. Rawung was charged with remaining in the country beyond the expiration of his B-2 visa on April 3, 1996. Although Rawung conceded the factual allegations in his NTA, Malonda denied that she entered the United States without a valid visa.

In Malonda's first appearance before the IJ on March 21, 2004, the IJ questioned Malonda's counsel about Malonda's denial of the allegation that she did not possess a valid visa. When asked about the denial, her attorney stated that he denied the allegation because he was not sure whether it was true. He also stated that he would concede removability if the government had proof of it and denied that Malonda had asserted that she was legally present in her application for asylum. When the IJ stated that he was "going to find that [Malonda] is removable, because it says so right in

her application for asylum[,]" Malonda's attorney responded, "That's fine, Your Honor."[2]

On November 14, 2005, the IJ conducted Malonda's merits hearing. When asked whether she had ever experienced any problems in Indonesia due to her religion, Malonda testified about the incident occurring early in the morning on June 6, 2001. This time, in her direct testimony, she described having been abruptly awakened when a man wearing nothing but a bandana around his head sat on her. After pushing him off her, he started shouting or chanting "Allah akbar," a phrase "only a Muslim would say." She also testified that some people "tried to do evil things" to her when she wore her "Cross necklace," and that she was advised to stop wearing it because people knew that Muslims were hunting for Christians. On cross-examination, however, she testified that her assailant was naked from the waist up, but was wearing pants, which he unzipped during the course of the attack.

The IJ denied Malonda's application for asylum and withholding of removal. While noting that some confusion existed

_____

[2] During this discussion between the IJ and Malonda's counsel about her removability, the government asserted that Malonda used her sister's passport in conjunction with her application for asylum. The IJ asked the government, "Wouldn't that be considered evidence that she is here illegally, or no?" Before the government had the opportunity to answer the question, the IJ proceeded with his questioning of Malonda's counsel without explicitly resolving the issue of whether Deby Ledy is Malonda's sister.

as to Malonda's charge of removability, the IJ determined that Malonda, through counsel, conceded removability. Turning first to evidence of past persecution, the IJ deemed not credible Malonda's testimony concerning the central event in her asylum application, the attempted rape or assault on June 6, 2001. In particular, he pointed to the discrepancy between Malonda's statement in her asylum application that the assailant wore a Muslim robe and her testimony at the hearing that he was fully or partially naked. The IJ reasoned that, as the only incident specifically referred to by Malonda, her testimony on the subject should have been consistent throughout. Even assuming the truth of Malonda's account, the IJ disbelieved that the attack was religiously motivated, because Malonda was residing in her brother-in-law's Muslim household at the time, giving the assailant no reason to believe that she was a Christian.

In finding that Malonda had failed to establish a well-founded fear of future persecution, the IJ noted that the Department of State country and religious freedom reports generally reported an improvement in conditions in Indonesia. The IJ also found it significant that Malonda's two Indonesian children continued to live in the country without experiencing harm; that Malonda had traveled to Indonesia three times since entering the United States, once with her six-year-old, American-born daughter; and that several of Malonda's siblings continued to live in

Indonesia in relative safety.  After denying Malonda's application, the IJ granted her voluntary departure.

The BIA upheld the IJ's denial of relief on April 24, 2007, in a per curiam opinion.  It found that the IJ's adverse credibility finding was supported by specific, cogent reasons, and that the IJ provided a reasonable basis for rejecting Malonda's explanation of the discrepancies in her account.  It also upheld the IJ's finding of removability based on his reading of Malonda's asylum application, as well as the concession made by her counsel.  Finally, the BIA affirmed the IJ's ruling on Malonda's CAT claim because of her failure to raise the issue on appeal.

## II.  Discussion

Where, as is the case here, "the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision, we have authority to review both the IJ's and the BIA's opinions." Ouk v. Gonzales, 464 F.3d 108, 110 (1st Cir. 2006).  We review the BIA's decision under the deferential substantial evidence standard. See id.  Under this standard, we will uphold factual determinations "unless the record is such as to compel a reasonable factfinder to reach a contrary determination." Pulisir v. Mukasey, 524 F.3d 302, 307 (1st Cir. 2008).  When reviewing an adverse credibility determination under this standard, "we narrowly inquire whether: (i) the discrepancies articulated by the IJ and/or the BIA are actually present in the administrative record; (ii) the

-7-

discrepancies generate specific and cogent reasons from which to infer that petitioner . . . provided non-creditworthy testimony; and (iii) petitioner failed to provide a persuasive explanation for these discrepancies." Cuko v. Mukasey, 522 F.3d 32, 37 (1st Cir. 2008).

## A.  Merits of the Claims

Malonda contends that the BIA's adverse credibility determination, as well as its determination that she failed to establish her asylum, withholding of removal, and CAT claims, were not supported by substantial evidence.  We begin by considering Malonda's asylum claim, because "a failure to qualify for asylum necessarily forecloses a petitioner's ability to qualify for withholding of removal or protection under CAT."  Santosa v. Mukasey, No. 07-2016, 2008 WL 2358004, at *2 (1st Cir. June 11, 2008); see also Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004) (noting that a withholding claim "demands that the alien carry a more stringent burden of proof than does an asylum claim").

An applicant for asylum bears the burden of proving that she is a refugee based upon either past persecution or a well-founded fear of future persecution on the basis of one of five statutory grounds.  See Wang v. Mukasey, 508 F.3d 80, 84 (1st Cir. 2007) (citing 8 U.S.C. § 1158(b)(1)).  "[P]ast persecution requires that the totality of a petitioner's experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair

-8-

treatment." Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005). Moreover, the claimed persecution must be "the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct." Id. at 121. Finally, testimony deemed incredible by the IJ may be disregarded or discounted. See Pan v. Gonzales, 489 F.3d 80, 86 (1st Cir. 2007).

Here, the evidence supports the IJ's determination that Malonda did not testify credibly concerning the attack on June 6, 2001. The record indicates that she told three versions of the same story: in one, her assailant wore a Muslim robe; in the second, he was naked; and in the third, he wore pants. Other details differ as well: in her asylum application, Malonda described being approached by a man wielding a screwdriver, but at her hearing, she claimed that she was roused from sleep when he sat on her. The IJ concluded that, as the single event supporting her claim of religious persecution, it "should have been the focus of her testimony and should have . . . been consistent throughout." Malonda did not indicate any reason preventing her from correcting the discrepancy. Therefore, we uphold the adverse credibility determination.

An adverse credibility determination can be fatal if an applicant cannot meet her burden of proof without the incredible testimony. See Melhem v. Gonzales, 500 F.3d 78, 81 (1st Cir. 2007)

(citing Pan, 489 F.3d at 86). That is the case here. Without Malonda's testimony, which was the sole evidence of past persecution, the evidence amply supports the BIA's finding that Malonda lacked an objectively reasonable fear of future persecution. Malonda "had to provide 'credible, direct, and specific evidence' that would support a reasonable fear of individualized persecution." Santosa, 2008 WL 2358004, at *4 (quoting Guzman v. INS, 327 F.3d 11, 16 (1st Cir. 2003)). The BIA found that the documentary evidence provided by Malonda did not satisfy this requirement and, to the contrary, Malonda's family who remained in Indonesia lived in relative safety. See, e.g., Sela v. Mukasey, 520 F.3d 44, 47 (1st Cir. 2008) (treating evidence of family safety in the petitioner's country of origin as evidence undermining a future persecution claim). Thus, the evidence does not compel reversal of the BIA's determination.

Having failed to establish her eligibility for asylum, Malonda's application for withholding of removal necessarily fails as well. See Makhoul, 387 F.3d at 82. Because Malonda "makes no argument with respect to the CAT claim beyond the introductory assertion that the record establishes the merits of her claim[] for . . . protection pursuant to the CAT[,]" we deem her CAT claim waived. Sok v. Mukasey, 526 F.3d 48, 52 (1st Cir. 2008) (internal quotation marks, alterations, and citation omitted).

## B.  Due Process

Although Malonda's brief advances theories that her hearing before the IJ violated her due process rights and effectively compelled her to be a witness against herself, her principal argument is that the government's failure to amend her NTA to allege the correct ground of removability prejudiced her in some way.  That is, in any event, the only claim of error she preserved below; consequently, it is the only one we have jurisdiction to review.  See Makhoul, 387 F.3d at 80 (relying on 8 U.S.C. § 1252(d)(1)'s exhaustion requirement to hold that "theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order").

The BIA rejected Malonda's due process claim for three reasons.  First, it found that rather than contesting the IJ's finding of removability, Malonda's counsel conceded it.  Second, the BIA found that Malonda failed to assert or demonstrate that she was prejudiced by the alleged error.  Third, relying on Matter of Salazar, 17 I. & N. Dec. 167 (BIA 1979), it held that an IJ may properly rule on a ground of removability that is first revealed at a hearing, as long as the petitioner has the opportunity to meet it.  We review due process claims de novo.  See Pulisir, 524 F.3d at 311.

We have previously recognized that aliens subject to removal proceedings are entitled to due process, including "the

right to notice of the nature of the charges and a meaningful opportunity to be heard." Kaweesa v. Gonzales, 450 F.3d 62, 69 (1st Cir. 2006) (citing Choeum v. INS, 129 F.3d 29, 38 (1st Cir. 1997)) (internal quotation marks omitted). In order to advance a due process claim, however, a petitioner "must allege some cognizable prejudice fairly attributable to the challenged process." Lattab v. Ashcroft, 384 F.3d 8, 20 (1st Cir. 2004); see also Grigous v. Gonzales, 460 F.3d 156, 163 (1st Cir. 2006) (applying the prejudice requirement to a claimed violation of a due process right to adequate notice).

We need not decide whether, and under what circumstances, the government's failure to amend a NTA might violate a petitioner's right to adequate notice of the charge of removability, because Malonda has made no showing that she was prejudiced by any failure to amend the NTA. Accordingly, we must affirm the BIA's decision and deny the petition.

The petition for review is DENIED.